**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| _____ | : | Civil Action No. 15-7555 (MLC) |
| NICHOLAS QUESTEL, | : | |
| | : | **MEMORANDUM OPINION** |
| Petitioner, | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Respondent. | : | |
| _____ | : | |

**COOPER, DISTRICT JUDGE**

Nicholas Questel ("Petitioner") filed this Petition for a writ of <u>coram nobis</u> under 28 U.S.C. § 1651(a) seeking to vacate his guilty plea and conviction.  (Dkt. 1 at 12.)[1]  The underlying criminal case before this Court was <u>United States v. Questel</u>, Crim. No. 10-709 (MLC), in which Petitioner pleaded guilty to conspiracy to import cocaine.  (Crim. No. 10-709, dkt. 19.)

Petitioner, a lawful permanent resident, contends that his defense attorney did not inform him, in violation of <u>Padilla v. Kentucky</u>, 599 U.S. 356 (2010), that a guilty plea would result in his removal from the United States.  (Dkt. 1; dkt. 1-2 at 5.)  This Court held

---

[1] The Court will cite to the documents filed on the Electronic Case Filing System ("ECF") by referring to the docket entry numbers by the designation of "dkt."  Pincites reference ECF pagination.  We have corrected obvious clerical errors in quoting transcripts, but no changes have been made to the content of testimony.

an evidentiary hearing to determine whether Petitioner's criminal defense attorney provided constitutionally defective assistance of counsel to Petitioner regarding the immigration consequences of the guilty plea.  (Dkt. 15; dkt. 21.)

For the reasons set forth below, this Court is satisfied that Petitioner's defense attorney advised Petitioner that his guilty plea would lead to his removal from the United States.  Therefore, the petition must be dismissed because Petitioner did not receive ineffective assistance of counsel during his criminal proceedings.

## I.    BACKGROUND

On April 5, 2010, Petitioner, Nicholas Questel, a lawful permanent resident of the United States, was arrested on an incoming flight at Newark Liberty International Airport with cocaine in his possession.  (Dkt. 1 at 3–4; dkt. 22 at 3–4.)  Petitioner is a citizen of Trinidad and Tobago, who was returning to the United States after a trip to his home country.  (Dkt. 1 at 3; dkt. 22 at 3.)

Petitioner subsequently waived his right to indictment and, at a Rule 11[2] hearing on October 20, 2010, pleaded guilty to a one-count information charging him with conspiring to important cocaine into the United States in an amount of 500 grams or more but less than 1,500 grams.   (Dkt. 7-5 at 7–12.)  This Court sentenced defendant to a term of three years probation on May 25, 2011.  (Crim. No. 10-709, dkt. 18.)  On June 9, 2011, this Court entered a judgment of conviction against Petitioner for conspiracy to import cocaine pursuant to 21 U.S.C. § 963.  (Id., dkt. 19.)

---

[2] Fed R. Crim. P. 11.

On February 22, 2013, while Petitioner was serving that probationary sentence, a Petition for Warrant or Summons for Offender Under Supervision was filed against him in this District.  (Id., dkt. 20.)  The Petition for Warrant alleged that Petitioner was arrested on January 15, 2013 in Newburgh, New York, and charged with "forgery, criminal possession of stolen property, grand larceny, attempted grand larceny, and credit card fraud."  (Id. at 1)

On September 13, 2013, this Court signed a Second Amended Petition and Order for Issuance of Arrest Warrant for Violation of Supervised Release for Petitioner.  (Id., dkt. 21.)  On February 26, 2015, a Judgment was entered against Petitioner for revocation of probation or supervised release.  (Id., dkt. 30.)  Consequently, Petitioner's previously imposed term of probation was revoked, and this Court sentenced Petitioner to a ten-month term of imprisonment.  (Id. at 2.)

When Petitioner completed serving that prison term, the Department of Homeland Security, Immigration and Customs Enforcement ("DHS/ICE") detained him on March 31, 2015 to address his immigration status.[3]  (Dkt. 1 at 5; dkt. 15 at 18–21; dkt. 22-4.)  As of this writing, that proceeding remains pending.  (Dkt. 21 at 53.)

---

[3] Petitioner was stopped at the airport and was denied admission into the United States, and as a result, Petitioner faced an exclusion proceeding.  (Dkt. 21 at 94–98.)  A more detailed discussion of the Petitioner's immigration status and the pending immigration action is found in this Court's opinion in Petitioner's separate habeas corpus action.  See Questel v. Green, No. 16-1637, 2016 WL 4744140 (D.N.J. Sept. 12, 2016).

3

On September 27, 2015, Petitioner filed this petition for a writ of <u>coram nobis</u> under 28 U.S.C. § 1651(a) seeking to vacate his guilty plea and conviction.[4]  (Dkt. 1 at 12.) Petitioner alleges that his defense attorney, Assistant Federal Public Defender Candace Hom, rendered constitutionally defective assistance of counsel by failing to notify him that his guilty plea would result in his almost-certain removal from the United States.  (Dkt. 1; dkt. 1-2 at 5.)

The Court ordered an evidentiary hearing to determine what advice defense counsel provided to Petitioner regarding the immigration consequences of his guilty plea and conviction.  (Dkt. 8 at 7.)  Petitioner waived his attorney-client privilege with respect to communications provided to him by his defense attorney during the legal representation of his underlying criminal action.  (Dkt. 13.)

## II.   EVIDENTIARY HEARING

### A.   Nicholas Questel, Petitioner

Petitioner testified on February 19, 2016.  (Dkt. 15.)  Petitioner is a high school graduate, and at the time of his guilty plea, he was nineteen years old.  (<u>Id.</u> at 23.)

According to Petitioner, Ms. Hom advised him that he may suffer possible immigration consequences by pleading guilty.  (<u>Id.</u> at 9.)  Petitioner acknowledged that Ms. Hom told him that he would likely be deported.  (<u>Id.</u> at 24.)  But Petitioner denied that she ever informed him that his removal from the United States would be almost certain or

---

[4] This petition for writ of <u>coram nobis</u> was initially filed as part of the criminal docket, (Crim. No. 10-709, dkt. 27), but a new civil docket number was subsequently assigned for the petition.

mandatory.  (Id. at 9–10.)  Petitioner was hopeful that removal would not occur and that he could remain in the United States.  (Id. at 24.)  He believed that "likely" meant a fifty-percent chance, and that it was not a certainty.  (Id. at 25.)

Ms. Hom advised him to contact an immigration lawyer, but he did not.  (Id. at 10.) Petitioner did contact a "consultant"—not an attorney—after pleading guilty.  (Id. at 10–11.)  Petitioner testified that his understanding of his immigration status was that "[p]ossibly immigration would step in and maybe get deported."  (Id. at 10.)  The immigration consultant told Petitioner that any sentence over a year would lead to mandatory deportation, and Petitioner knew that he faced a sentence of up to eighteen months.  (Id. at 44–47.)

Petitioner testified that had he known that the offense to which he pleaded guilty would lead to his almost-certain removal from the United States, then he would not have entered a plea and would have instead elected to contest the charge at trial.  (Id. at 22.) Petitioner acknowledged at the evidentiary hearing, however, that he previously testified at the Rule 11 hearing that he wanted to plead guilty, even if the plea would cause his removal, because probation was a better option for him than a potential five-year jail sentence.  (Id. at 52.)

In September 2013, Petitioner spoke with Melvin Solomon, an immigration attorney.  (Id. at 12–13.)  Petitioner explained that he knew of potential ICE interest in him in September 2013.  (Id. at 36.)  But according to Petitioner, he first learned of the mandatory nature of his removal on March 31, 2015.  (Id. at 40.)

On March 30, 2015, after serving a ten-month federal probation violation sentence, Petitioner received notice from DHS/ICE, and was taken into custody the next day.  (Dkt. 15 at 18–21; dkt. 22-4.)  After receiving the notice, Petitioner spoke with Mr. Solomon, who told him that the underlying conviction for an aggravated felony would almost certainly lead to removal from the United States.  (Dkt. 15 at 21.)  Mr. Solomon advised of two ways to avoid deportation—filing for asylum or having the criminal conviction lowered from an aggravated felony.  (Id. at 50.)  Mr. Solomon informed Petitioner that his eligibility for asylum was unlikely.  (Id. at 21.)

**B.    Candace Hom, Esq., Assistant Federal Public Defender**

On August 1, 2016, the Government called as a rebuttal witness Candace Hom, Assistant Federal Public Defender, who was appointed as counsel to Petitioner on April 6, 2010 following his arrest and served as his attorney through the date of his sentencing. (Dkt. 21 at 8–9, 32.)

Ms. Hom testified that "I remember Nicholas, and I remember his case, and I know that there were certain issues that were very concerning for him, and so, as a result, I do have some specific recollections regarding his case."  (Id. at 2.)   Ms. Hom was aware that the offense Petitioner pleaded guilty to was an aggravated felony and the offense "carried severe immigration consequences" for a conviction.  (Id. at 44.)

Ms. Hom advised Petitioner that the crime for which he was charged carried a mandatory minimum prison sentence of five years.  (Id. at 14.)  Ms. Hom had conversations with the Government as to whether Petitioner could receive any benefit, in the form of

6

more lenient sentencing, if his father cooperated with the Government in the father's pending criminal action.  (Id. at 11–13.)

Ms. Hom explained that her practice with her clients was to discuss the possibilities of going to trial or pleading guilty, including discussing the government's proofs, potential defenses to be raised at trial, and the potential sentencing consequences for trial compared to pleading guilty.  (Id. at 10.)  When recalling potential collateral consequences for a guilty plea, she explained that "[w]ith Nicholas I certainly -- my recollection is mainly about the immigration consequences and that he would be deported as a result."  (Id. at 15.)  Ms. Hom's recollection was that Petitioner did not wish to pursue a trial.  (Id. at 11.)

Prior to the plea hearing, she and Petitioner "certainly did have discussions regarding the deportation consequences of his guilty plea."  (Id. at 8.)  Although Ms. Hom could not recall the date that she discussed the immigration consequences of the plea, she knew it was after the arrest and before the plea hearing.  (Id. at 16.)  Ms. Hom also advised Petitioner to speak with an immigration attorney because his mother had citizenship and Petitioner might derive some benefit from his mother's status.  (Id. at 19.)

Ms. Hom recalled "that I did advise him that he would be deported."  (Id. at 7.)  She specified that:  "I advised him he would be deported.  I probably said it in a number of different ways.  He would be deported, he will be deported, maybe subject to deportation, or he would be removed from the United States, but those are different ways of saying it."  (Id. at 19.)  In any language she used, Ms. Hom explained to Petitioner that his removal

was a certainty.  (Id.)  Ms. Hom did not believe that she "left any ambiguity with him" regarding his immigration consequences.  (Id. at 21.)

Ms. Hom explained that her usual practice with her clients is to discuss their situation in their home country, such as the presence of relatives and job prospects.  (Id. at 18.)  With respect to her representation of Petitioner, she recalled that:

> his father [was] going to be returning back to his home country, possibly a grandmother was there.  But I think his main concern was that he was certified as an airline mechanic, and I think his worry was what kind of job is he going to get if he is certified here.  And, obviously I tried to explain that he really has got to be realistic about what is going to happen and that he's got to find some sort of employment once he gets home, and hopefully it would be similar to what he's been certified here in the United States for.

Id. at 18–19.

Ms. Hom testified that she reviewed a Rule 11 application for permission to enter a guilty plea with Petitioner, and counseled him what the form meant by "will likely" be removed from the United States.  (Id. at 16, 21; see Crim. No. 10-709, dkt. 19 at 5.)  She explained that she believed that such language "provid[es] some sort of likelihood," but she "str[o]ve to be more certain in [her] advice to [her] clients," which is why she gave more detailed advice to Petitioner.  (Dkt. 21 at 22.)

When asked why she did not write additional information on the Rule 11 form when circling the "will likely" option, Ms. Hom answered:

> I thought that Nicholas was clear from my counsel to him that it was a certainty, and, perhaps, you know, it is possible it would have provided more certainty, but at this moment in time after we had discussed it coming to the Rule 11 form I'm sure

> I reiterated my advice to him and that it was a certainty, but
> circled "will likely" because it was one of the two options.

Id. at 28.

Ms. Hom had further conversations with Petitioner about his immigration consequences following the plea and before the sentencing.  (Id. at 22.)  Prior to the sentencing, she advised Petitioner "that it is possible that ICE could show up to his sentencing to arrest him and bring him into immigration custody for deportation."  (Id. at 15, 22.)  She specifically remembered this advice because it was unusual for her to have a non-United States citizen client out on bail.  (Id. at 15.)

Ms. Hom testified that during her representation of Petitioner she would meet with him in her office rather than communicating via letters, which was her normal practice for her incarcerated clients.  (Id. at 28–29.)  Ms. Hom explained that "during the course of [Petitioner's] case there never appeared to [her] to be any confusion about anything that was taking place with respect to immigration, with respect to the issues for sentencing, the plea agreement, that would cause [her] to write such a letter summarizing his case."  (Id. at 28–29.)  In this criminal matter, Ms. Hom wrote Petitioner three letters, attaching a lab report, the plea and cooperation agreements, and test results.  (Id. at 34–36; dkts. 22-1, 22-2, 22-3.)

At the time of the evidentiary hearing, Ms. Hom did not have notes indicating that she discussed the immigration consequences with Petitioner in her office case folder, but she explained that sometimes notes are removed from the file after a matter is closed to save space during storage.  (Dkt. 21 at 39–40.)  At the evidentiary hearing, she observed

9

that Petitioner's case file did not have the normal amount of notes that a typical file does. (Id. at 40.)

### C.     Melvin Solomon, Esq., Immigration Attorney

Melvin Solomon testified telephonically on August 1, 2016.  Mr. Solomon, who has been an attorney since 1971, primarily practices in immigration and nationality law, which he has done full time for thirty-five years.   (Id. at 52.)   He represents Petitioner in Petitioner's pending immigration case, which is on hold while this post-conviction application proceeds.  (Id. at 53.)

Mr. Solomon explained that there is "virtually no relief available" for an individual, like Petitioner, who was convicted of an aggravated felony.  (Id.)  Mr. Solomon testified that "[w]ith [his] conviction there's no relief available to [Petitioner]."  (Id. at 56.)  The only relief Petitioner could apply for is under the Convention Against Torture, but "being from Trinidad his chances of prevailing on that are virtually nonexistent because he would have to show it's more likely than not he would be tortured by officials of the Government." (Id. at 54.)

## III.    DISCUSSION

### A.     Legal Framework

#### 1.     Petition for Writ of __Coram__ __Nobis__

This Court has jurisdiction over this petition for a writ of coram nobis under the All Writs Act, 28 U.S.C. § 1651(a).

The United States Supreme Court observed in <u>Chaidez v. United States</u>, 133 S. Ct. 1103 (2013), that a petition for a writ of <u>coram</u> <u>nobis</u> is an appropriate procedural vehicle for challenging a federal conviction after a sentence was fully served and the petitioner faces deportation proceedings:

> A petition for a writ of <u>coram</u> <u>nobis</u> provides a way to collaterally attack a criminal conviction for a person, like Chaidez, who is no longer "in custody" and therefore cannot seek habeas relief under 28 U.S.C. § 2255 or § 2241. Chaidez and the Government agree that nothing in this case turns on the difference between a <u>coram</u> <u>nobis</u> petition and a habeas petition, and we assume without deciding that they are correct.

<u>Id.</u> at 1106 n.1 (internal citation omitted).

<u>Coram</u> <u>nobis</u>, similar to <u>habeas</u> <u>corpus</u>, "is an extraordinary remedy, and a court's jurisdiction to grant relief is of limited scope." <u>United States v. Stoneman</u>, 870 F.2d 102, 106 (3d Cir. 1989). The standard for granting a writ of <u>coram</u> <u>nobis</u> "is even more stringent than that on a petitioner seeking <u>habeas</u> <u>corpus</u> relief under § 2255." <u>Id.</u> However, when a <u>Padilla</u>-claim is the type of claim asserted, the standard for deciding a <u>coram</u> <u>nobis</u> petition is the same as it would be under 28 U.S.C. § 2255. <u>Chaidez</u>, 133 S.Ct. at 1106 n.1.

The burden of proof is on the petitioner in a <u>coram</u> <u>nobis</u> proceeding, as it is under Section 2255. Thus, on a <u>coram</u> <u>nobis</u> petition, "[e]arlier proceedings are presumptively correct and the petitioner bears the burden to show otherwise." <u>Stoneman</u>, 870 F.2d at 106.

### 2.    Ineffective Assistance of Counsel

The Sixth Amendment provides in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S.

Const. amend. VI.  "A defendant has a Sixth Amendment right not just to counsel, but to 'reasonably effective assistance' of counsel."  United States v. Day, 969 F.2d 39, 42 (3d Cir. 1992) (quoting Strickland v. Washington, 466 U.S. 668, 687 (1984)).  The Supreme Court in Strickland set forth a two-pronged test for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

Strickland, 466 U.S. at 687.

The appropriate measure of attorney performance is "reasonableness under prevailing professional norms."  Strickland, 466 U.S. at 688.  A petitioner asserting a claim of ineffective assistance of counsel must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  Id. at 690.  Courts must generally recognize the strong presumption that counsel has rendered adequate assistance and that all significant decisions were made in the exercise of reasonable professional judgment.  Id. at 689; see Buehl v. Vaughn, 166 F.3d 163, 169 (3d Cir. 1999); Reese v. Fulcomer, 946 F.2d 247, 256-57 (3d Cir. 1991); United States v. Gray, 878 F.2d 702, 710 (3d Cir. 1989).  The evaluation of the objective reasonableness of counsel's

performance must be made "from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." Kimmelman v. Morrison, 477 U.S. 365, 381 (1986).

The second prong of the Strickland test requires the petitioner to show that counsel's deficient performance prejudiced the defense. Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Strickland, 466 U.S. at 691. The petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

Here, Petitioner challenges the validity of his guilty plea based upon the consequences of that plea on his immigration status. The established test for determining the validity of a guilty plea is "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." North Carolina v. Alford, 400 U.S. 25, 31 (1970). Where a defendant is represented by counsel and enters a guilty plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice "'was within the range of competence demanded of attorneys in criminal cases.'" Hill v. Lockhart, 474 U.S. 52, 56 (1985) (quoting McMann v. Richardson, 397 U.S. 759, 771 (1970)).

Hill v. Lockhart holds that a claim of ineffective assistance of counsel in the context of a guilty plea is subject to the same standard of attorney competence set forth in the first prong of the Strickland test. 474 U.S. at 58-59. However, the Hill Court specifically held

13

that where the collateral challenge is to a plea of guilty rather than a trial verdict, the "prejudice" prong requires the petitioner to "show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Id.; see Parry v. Rosemeyer, 64 F.3d 110, 118 (3d Cir. 1995). In setting forth that standard, the Court in Hill emphasized the "fundamental interest in the finality of guilty pleas." Hill, 474 U.S. at 58 (citing United States v. Timmreck, 441 U.S. 780, 784 (1979)).

The Strickland Court further held that both the "performance" and the "prejudice" prongs must be established to meet the petitioner's burden, and that if either prong is not satisfied the claim must be rejected, stating:

> Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.

Id. at 697.

The Supreme Court in Padilla v. Kentucky, 599 U.S. 356 (2010), adopted new constitutional requirements with respect to the advice that defense counsel must provide to a client regarding the immigration consequences of a guilty plea. See Chaidez, 133 S. Ct. at 1105, 1110-11. The Court ruled that, "[i]t is quintessentially the duty of counsel to

provide her client with available advice about an issue like deportation and the failure to do so 'clearly satisfies the first prong of the <u>Strickland</u> analysis.'" <u>Padilla</u>, 559 U.S. at 370 (quoting <u>Hill</u>, 474 U.S. at 62).

The petitioner in <u>Padilla</u>, a long-time lawful permanent resident of the United States, pleaded guilty to a drug-related charge that was a deportable offense under 8 U.S.C. § 1227(a)(2)(B)(i).  Padilla claimed that his defense attorney not only failed to tell him of this consequence prior to his entering the plea, but also advised him that he did not have to worry about his immigration status because he had been in this country so long.  <u>Id.</u> at 359-60.  Accepting these allegations as true, the Court found that Padilla had "sufficiently alleged constitutional deficiency to satisfy the first prong of <u>Strickland</u>."  <u>Id.</u> at 369.

In setting forth the new framework, the Court emphasized the importance for a noncitizen defendant to receive accurate legal advice on immigration consequences because "deportation is an integral part--indeed, sometimes the most important part--of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes."  <u>Id.</u> at 364.  The Court observed that changes in the immigration laws has made removal "nearly an automatic result" for a "broad class" of noncitizen defendants.  <u>Id.</u> at 366.

The Court found that "constitutionally competent counsel" would have informed Padilla that his drug distribution conviction "made him subject to automatic deportation." <u>Id.</u> at 360.

> Padilla's counsel could have easily determined that his plea
> would make him eligible for deportation simply from reading

> the text of the statute, which addresses not some broad classification of crimes but specifically commands removal for all controlled substances convictions except for the most trivial of marijuana possession offenses.  Instead, Padilla's counsel provided him false assurance that his conviction would not result in his removal from this country.  This is not a hard case in which to find deficiency:  The consequences of Padilla's plea could easily be determined from reading the removal statute, his deportation was presumptively mandatory, and his counsel's advice was incorrect.

Id. at 368-69

Although Padilla's defense attorney affirmatively provided inaccurate legal advice, the Supreme Court specifically declined to adopt a constitutional rule that only assured the prevention of affirmative misadvice by counsel.  Id. at 369-70.  The Supreme Court expressed the responsibilities of counsel going forward:  "When the law is not succinct and straightforward . . ., a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences. But when the deportation consequence is truly clear, as it was in this case, the duty to give correct advice is equally clear."  Id. at 369.

The Third Circuit retroactively[5] applied Padilla as requiring that "counsel, in order to be constitutionally competent, has an obligation to advise criminal defendants whether an offense to which they may plead guilty will result in removal from the United States."

---

[5] Although the Supreme Court later held that Padilla did not apply retroactively (and rejected the approach taken by the Third Circuit), the Supreme Court reaffirmed that "criminal defense attorneys must inform non-citizen clients of the risks of deportation arising from guilty pleas." See Chaidez, 133 S. Ct. at 1106-07.  Thus, the Third Circuit's application and interpretation of Padilla in Orocio is still persuasive to this Court even though the court's retroactive analysis has been rejected.

United States v. Orocio, 645 F.3d 630, 636 (3d Cir. 2011), abrogated on other grounds by

Chaidez v. United States, 133 S. Ct. 1103 (2013).  Echoing the Supreme Court's

pronouncement of the importance of immigration consequences to a noncitizen defendant,

the Third Circuit noted:

> For the alien defendant most concerned with remaining in the
> United States, especially a legal permanent resident, it is not at
> all unreasonable to go to trial and risk a ten-year sentence and
> guaranteed removal, but with the chance of acquittal and the
> right to remain in the United States, instead of pleading guilty
> to an offense that, while not an aggravated felony, carries
> "presumptively mandatory" removal consequences.

Id. at 645.

The petitioner in Orocio had alleged that his defense attorney "wholly failed to

advise him of the near-certain removal consequence of pleading guilty to a controlled

substance offense." Id. at 642.  The district court had dismissed the complaint, without

addressing the effectiveness of counsel and the first prong of Strickland, because Orocio

had failed to demonstrate prejudice under the second prong.  Id. at 635.

On appeal, the Third Circuit found that the drug offense in Orocio, like that in

Padilla, did not carry uncertain or complex immigration consequences.  Id. at 636 & n.5.

Therefore, the court concluded that if Orocio's defense attorney failed to advise his client

of the immigration consequences, as alleged, then the attorney's performance would have

been constitutionally deficient.  Id. at 642-43.  The Third Circuit remanded the matter for

further proceedings.  Id. at 646.

## B.    Parties' Arguments

Petitioner argues that his petition should be granted, and that he should be allowed to withdraw his guilty plea because his defense attorney provided constitutionally defective assistance in violation of <u>Strickland</u> and <u>Padilla</u>.  Specifically, Petitioner argues that counsel failed to inform him that by pleading guilty to conspiracy to import cocaine into the United States, his deportation would be presumptively mandatory.  (Dkt. 22 at 28.) Had he known, Petitioner would not have pleaded guilty, and instead would have elected to fight the charge at trial.  (<u>Id.</u> at 18.)  Petitioner also argues that there was no delay in filing this petition and he did so shortly after learning from his immigration attorney that he was subject to presumptive mandatory removal.  (Dkt. 25 at 8.)

The Government argues that the testimony by Petitioner's defense attorney at the evidentiary hearing demonstrates that she informed Petitioner of the immigration consequences of his guilty plea, and thus she did not provide ineffective assistance.  (Dkt. 23 at 2.)  The Government also argues that the petition should be dismissed because Petitioner lacked "sound reasons" for not seeking relief when he had an earlier opportunity to do so.  (<u>Id.</u> at 2–3.)

### C.    Analysis

In this action, examination of the record of the underlying criminal case and the testimony developed at the evidentiary hearing conclusively shows that Petitioner cannot meet his burden of proof on either prong of the <u>Strickland</u> test as to his <u>Padilla</u> claim.[6]

The Court finds that Ms. Hom was a credible witness.  She was able to recall with specificity certain details about Petitioner's case and his situation that indicate she advised Petitioner that his guilty plea would result in his removal from the United States.  And she was candid when she was unable to recall specific instances or details about Petitioner's criminal case.  Ms. Hom was also subject to a full cross-examination.

Contrary to Petitioner's claims, the facts in <u>Orocio</u> are not "essentially identical" to his situation.  (<u>See</u> dkt. 22 at 27.)  Orocio alleged that his defense attorney provided <u>no</u> advice to him on the near-certain removal consequences of the guilty plea.  <u>Orocio</u>, 645 F.3d at 642.  In the present matter, the Court finds significant support in the record that Ms. Hom advised Petitioner of the near-certain immigration consequences of pleading guilty.[7]

---

[6] The case law requires that a <u>coram</u> <u>nobis</u> petition be presented without unreasonable delay.  <u>See</u> <u>Mendoza v. United States</u>, 690 F.3d 157, 159-60 (3d Cir. 2012) (affirming denial of <u>coram</u> <u>nobis</u> petition on basis of unreasonable delay when petitioner had waited four years to allege that his counsel had rendered ineffective assistance), <u>cert. denied</u>, 133 <u>S. Ct.</u> 1456 (2013).  Because this Court finds that Ms. Hom did not render ineffective legal representation, the Court need not determine whether there was unreasonable delay in the filing of this <u>coram</u> <u>nobis</u> as the Government argues.  (<u>See</u> dkt. 23 at 2–3.)

[7] There is no allegation in this matter that the defense attorney provided inaccurate legal advice such as in <u>Padilla</u>, 559 U.S. at 359-60, and <u>United States v. Fazio</u>, 795 F.3d 421, 424, 427 (3d Cir. 2015).

Ms. Hom was clear that she informed Petitioner that his guilty plea would lead to his removal from the United States.  She "advised him that he would be deported."  (Dkt. 21 at 19.)  When reviewing the plea application form with Petitioner, Ms. Hom was "sure" that she reiterated her advice to him that his removal was a certainty.  (Id. at 28.)

Ms. Hom was able to cite specifics about Petitioner's case and situation that lend credence to her testimony that she told Petitioner he would be deported.  Ms. Hom discussed with Petitioner his job prospects in Trinidad and Tobago and his family members who reside there.  (See dkt. 21 at 19, 21.)  As Ms. Hom explained, she did this because she "tried to explain that he really has got to be realistic about what is going to happen."  (Id. at 19.)  The fact that this conversation took place supports Ms. Hom's testimony that she had informed Petitioner of his near-certain removal from the United States and return to Trinidad and Tobago.

Ms. Hom also remembered Petitioner's case, in part, because it was unusual for her to have a noncitizen client who was out on bail and not incarcerated.  (Id. at 15.)  As a result, she recalled advising Petitioner that ICE could show up to his sentencing to arrest him and begin the removal process.  (Id.)  The prospect of ICE showing up at Petitioner's sentencing not only conveys to Petitioner an inevitable removal, but also an imminent one as well.

Petitioner focuses on the fact that Ms. Hom's legal advice on the immigration consequences was not memorialized in a letter or other writing.  (See dkt. 22 at 23–25.) As Ms. Hom explained though, it was not her practice to send legal communications to her

clients who were not incarcerated.  (Dkt. 21 at 28–29.)  The three letters Ms. Hom sent to Petitioner in the course of representing him reflect that.  None of these letters were for the purpose of communicating legal advice; rather all three letters were short cover letters attaching reports, forms, or documents to Petitioner.  (See dkts. 21-1, 21-2, 21-3.)  There is no indication that Ms. Hom provided other legal advice to Petitioner in writing yet omitted advice pertaining to the immigration consequences.  Ms. Hom's clear testimony that she rendered the legal advice on the immigration consequences in person, and not in writing, is not diminished by the fact that she wrote three letters to Petitioner for other purposes.

The plea colloquy during the underlying criminal proceedings underscored the advice provided by counsel and further ensured that Petitioner was aware of the immigration consequences of his plea.  (Dkt. 7-5 at 29–30.)  Petitioner also acknowledged his satisfaction with Ms. Hom's legal representation.  (Id. at 28–29, 33.)

The focal point of the evidentiary hearing was to ascertain whether Petitioner was adequately and accurately advised of the immigration consequences of his guilty plea.  This Court finds that he was.  Based on this record, the Court finds that Ms. Hom did not provide constitutionally deficient legal representation in advising Petitioner about the immigration consequences of his guilty plea and conviction.  Thus, Petitioner is unable to satisfy the first prong of the Strickland test.[8]

---

[8] The precision in the advice that Ms. Hom provided to Petitioner—that he would be removed if he pleaded guilty—obviates the need for this Court to resolve whether the less-specific language of the Rule 11 plea application form—that the guilty plea "will likely" result in removal—would survive the constitutional requirements set forth in Padilla and Fazio that a defendant is "entitled

The record equally shows that the "prejudice" prong of Petitioner's claim is lacking in proof.  Even assuming that Petitioner is correct and that Ms. Hom provided deficient advice to him, any prejudice that may have existed in that advice was cured by Petitioner's statements during the plea colloquy.  See United States v. Fazio, 795 F.3d 421, 428 (3d Cir. 2015) ("[A]ny possible error in plea counsel's advice to Fazio was cured by the plea agreement and at the plea colloquy."); Tomiwa v. United States, No. 16-3342, 2016 WL 4472954, at *6 (D.N.J. Aug. 24, 2016) ("Petitioner knowingly, voluntarily, and intelligently pleaded guilty even after being informed immigration proceedings were very likely and could lead to his removal from the country.").

---

to be 'advised . . . that his conviction for drug distribution made him subject to automatic deportation.'"  Fazio, 795 F.3d at 428 (quoting Padilla, 559 U.S. at 360).  It is unclear if the "will likely" language, on its own, is sufficiently precise to inform a defendant of the immigration consequences when removal from the United States seems the clear result of the conviction.  See Padilla, 559 U.S. at 369 ("[W]hen the deportation consequence is truly clear . . . the duty to give correct advice is equally clear."); accord Fazio, 795 F.3d at 427; Orocio, 645 F.3d at 646.

When the immigration consequences are "truly clear," a better practice for the courts, the Government, and defense counsel may be to provide more precise language (rather than the current language of "will likely") to explain to a defendant and lay person the high likelihood of removal.  See, e.g., Padilla, 559 U.S. at 360 ("subject to automatic deportation"); id. at 369 ("deportation was presumptively mandatory"); Fazio, 795 F.3d at 427 ("subject to automatic removal"); Orocio, 645 F.3d at 642 ("near-certain removal consequence").

The Third Circuit has also identified other means to ensure that a defendant pleads guilty knowingly, voluntarily, and intelligently, notwithstanding any deficient legal advice the defense attorney gives on the immigration consequences of a guilty plea.  The plea form that was used in Fazio, for example, required that "Defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his plea may entail, even if the consequence is his automatic removal from the United States," and the plea colloquy reiterated that.  See Fazio, 795 F.3d at 423.  This was done in the colloquy in the underlying criminal matter here when Petitioner asserted that he wanted to plead guilty notwithstanding any immigration consequences, including removal, (see dkt. 7-5 at 29–31), but the plea application form in this case did not contain language with the same precision used in the Fazio form.

During the plea colloquy, Petitioner specifically indicated that he wanted to plead guilty even if the result of that plea would "cause [his] removal from the United States." (Dkt. 7-5 at 29.)  Before accepting the plea, the Court confirmed that that Petitioner was willing to plead guilty notwithstanding the immigration consequences of a conviction.  (Id. at 29–30.)  At the evidentiary hearing, Petitioner explained that he wanted this plea deal with a sentence of probation, even if it meant his removal from United States, in order to avoid a potential five-year minimum jail sentence upon conviction at trial and then still face removal after the completion of that sentence.  (Dkt. 15 at 52.)  Thus, the evidence fails to establish, as required under the Strickland/Hill prejudice prong, that if Petitioner had known of the likely deportation consequences, he would not have pleaded guilty and would have instead elected to pursue a trial.

## IV.    CONCLUSION

For the reasons set forth above, the Court finds that the record in the Petitioner's criminal action and developed at the evidentiary hearing in this matter conclusively demonstrates that Petitioner fails to establish a violation of the Sixth Amendment under Strickland v. Washington and Padilla v. Kentucky.  Therefore, the petition for a writ of coram nobis must be denied.  The Court will issue an appropriate order.


                                               s/ Mary L. Cooper
                                              **MARY L. COOPER**
                                              United States District Judge


**Dated:**  October 13, 2016